[Civ. No. 1225. Third Appellate District.—August 7, 1914.]

NORTHERN LIGHT MINING COMPANY (a Corporation), Respondent, v. BLUE GOOSE MINING COMPANY (a Corporation), Appellant.

MINES AND MINERALS—LEASE OF PROPERTY—ACTION TO RECOVER RENT OR ROYALTIES.—In an action by the lessor against the lessee of a gold mining claim to recover rents or royalties, a complaint which sets out the execution of a lease of mining property by the plaintiff to the defendant, the entry thereunder by the latter into possession of the premises, the extraction therefrom of a certain value of gold, the amount due the plaintiff under the lease and the payment of all such amount except a stated sum, no part of which has been paid, states a cause of action.

ID.—DEMAND OF PAYMENT—NECESSITY OF ALLEGING.—An allegation of a demand for the payment of the rent or royalties is not essential to the statement of such cause of action, if the lease is uncertain in not designating whether the rent is payable in gold dust or money, and also in failing to designate any particular day or place of payment.

ID.—FUTILITY OF DEMAND—WHETHER EXCUSES NECESSITY OF MAKING. The purpose of a demand in such a case is to afford the defendant an opportunity to comply with it without the annoyance and expense of suit, but when it appears from the answer that a demand would have been unavailing and a mere useless and idle ceremony, the law does not require it.

ID.—JUDGMENT UPON PLEADINGS—WHEN PROPER.—In such action a judgment on the pleadings is properly granted the plaintiff, if the

conclusion necessarily follows from the admitted facts that it is entitled to judgment for the sum claimed, notwithstanding a denial in the answer of any sum now due, owing, and unpaid to the plaintiff from the defendant, which denial involves a mere legal conclusion.

ID.—PLEADING—ALLEGATION IN ANSWER OF CONTRACT DIFFERENT FROM THAT DECLARED UPON IN COMPLAINT.—An allegation in the answer that after the defendant had notified the plaintiff of an intention to abandon the premises, and while the defendant was actually engaged in moving, the plaintiff employed the defendant to extract gold from certain blocks of unworked ground, lacks responsiveness and relevancy to the cause of action, in the absence of any allegation or circumstance showing that such agreement had any relation to the lease or was intended to modify or affect it in any manner. As a matter of pleading the defendant could not avoid a contract alleged in the complaint by answering that he had made with the plaintiff another and different contract.

ID.—ABANDONMENT OF LEASED GROUND—ALLEGATION OF CUSTOM.—An allegation in the answer of a custom among miners permitting a lessee to remove from the premises at any time he chooses, is also unresponsive to the complaint, if it does not appear how this custom could or did impair the right of the plaintiff to receive the rent or royalty provided for in the lease, or in what manner this custom affected the acts of the parties to the contract.

ID.—CUSTOM OR USAGE—WHEN NOT ADMISSIBLE TO VARY CONTRACT.—If the terms of the lease are plain as to the period during which mining operations were to be carried on by the lessee, no evidence of custom is admissible on the subject of abandonment of work before the expiration of the term. A contract cannot be varied by evidence of custom or usage; custom can be shown only when the terms of the contract are obscure or uncertain.

ID.—BREACH OF LEASE BY LESSEE—MANNER OF CALCULATING DAMAGES.— If before the end of the term the lessee abandoned work on the claim, and the lessor brings an action to recover royalties, in which the lessor proves the total number of cubic yards of gold-bearing gravel that the defendant could have mined between the date of the abandonment and the end of the season, the average gold value of the gravel per yard, and the best obtainable or market percentage of royalty for working the claim at the date of the breach or thereafter, damages figured on the basis of such evidence are not objectionable as being uncertain. Since the difficulty of ascertaining exactly how much the plaintiff was injured arose from the defendant's breach of contract, scant attention will be paid to its complaint that greater accuracy is not obtainable.

ID.—INTERPRETATION OF LEASE—PROVISION FOR CONTINUOUS WORK.—A provision in the lease that the defendant would work the properties "as steadily and continuously from the date of this lease as the weather and season of each year would permit during the aforesaid

term," did not warrant the defendant in discontinuing the work if it proved unprofitable or by reason of any custom alleged to prevail, but obligated it to continue operations during the entire term of the lease, except when prevented by the weather and season of the year.

ID.—ABANDONMENT OF MINE BY LESSEE—DUTY OF LESSOR TO WORK IT.—Upon the abandonment of the mining properties by the lessee, the lessor was not required to work the ground, nor obtain another lessee to do so, but it had a right to rely upon the faith of the lessee pledged to the observance of all the terms of the lease, and to recover damages in case of default by the lessee.

ID.—CUSTOM OF MINERS—JUDICIAL NOTICE.—In an action by the lessor to recover from the lessee on account of the latter abandoning the mining properties, the court will not take judicial notice of a custom of miners that a lessee, in the absence of an express provision in the lease to the contrary, is authorized to cease work at his pleasure.

ID.—CONTRACT FOR WORKING MINING PROPERTIES—WHETHER LEASE OR LICENSE.—If the instrument under which the mining properties were to be worked is styled an "indenture of lease," designates the parties as "lessor" and "lessee," "grants, demises, leases and lets" unto the lessee for a term of years not only the right and privilege of mining but the land itself, provides for the payment of "rent," and contains the forfeiture and entry clauses and those against assigning or subletting which are usually found in leases, it will be regarded as a lease, not a mere license.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order refusing a new trial. Geo. A. Sturtevant, Judge.

The facts are stated in the opinion of the court.

Fink & White, Metson, Drew & MacKenzie, and Horatio Alling, for Appellant.

W. S. Andrews, and A. H. Brandt, for Respondent.

BURNETT, J.—The complaint was in two counts to recover damages for different breaches of a written contract providing for the lease of certain gold mining claims in which plaintiff was the lessor and defendant the lessee. The first count was based upon defendant's failure to pay plaintiff the sum of $2,611.68, the amount due as rent and royalty under the terms of said lease, and the second count sought damages for defendant's refusal to continue dredging on the demised premises for the balance of the term.

Respondent moved for judgment on the pleadings as to the first count and the motion was granted and from said order the defendant has appealed. There was a trial as to the second count and plaintiff obtained a judgment thereon for $8,375, from which also defendant has appealed.

As to the judgment on the pleadings error is claimed for the following reasons: 1. That the first count of the complaint does not state a cause of action; and, 2. That the answer thereto states three complete defenses, to wit: there was no money due, there was an executed oral agreement modifying the lease, and a custom existed permitting the abandonment of leased mining ground.

The said first count, after alleging the incorporation of plaintiff and defendant and the execution of said lease, a copy of which is attached and made a part of the complaint, proceeds: "IV. That in and by said written agreement or lease the plaintiff granted, leased, demised and let unto the defendant for a period of three years commencing on the 10th day of May, 1907, and expiring on the 10th day of May, 1910, certain placer mining claims" (describing them).

"V. That in consideration of said lease the lessee, the defendant herein, covenanted and agreed with the plaintiff to enter upon said mining claims and premises above described and to work the same mine fashion with its steam dredger known as the 'Alpha' in a manner necessary to good and economical mining, so as to take out the greatest amount of gold and precious metals possible with due regard to the safety, development and preservation of said premises as workable mines; further, the defendant agreed to work all the gold-bearing gravel on said claims from rim to rim wherever it was practical to float said dredger and to *do said work as steadily and continuously from the date of this lease as the weather and season of each year would permit during the aforesaid term;* and said defendant further agreed to pay and deliver to said lessor as royalty and rent thirty-three and one third per cent of all gold and precious minerals extracted from said premises during any single year until the gross yield during any single year should have amounted to fifty thousand dollars and thereafter during said year to pay and deliver to said lessor as rent and royalty forty per cent of all gold and precious minerals extracted from said premises in excess of said fifty thousand dollars until the gross

yield during any single year should have amounted to two hundred thousand dollars; and defendant further agreed to pay to the plaintiff as rent and royalty for said premises fifty per cent of all gold and precious minerals extracted in any single year in excess of two hundred thousand dollars; these royalties to be so paid were to be of like assay as those retained by the lessee and payment was to be made at such time and place as the lessor, the plaintiff herein, should direct.

"VI. That thereafter, upon the execution and delivery of said agreement of lease, the defendant entered upon the aforesaid described premises and commenced mining thereon as aforesaid: that during the year 1909 the defendant extracted gold from said premises valued in the sum of sixty-two thousand eighty-four and 64/100 dollars; that of said sum of $62,084.64 the plaintiff was entitled under its said contract to the sum of twenty-one thousand five hundred and 51/100 dollars. That the defendant has paid to the plaintiff the sum of eighteen thousand eight hundred eighty-eight and 83/100 dollars and no more; and that there is now due, owing and unpaid to the plaintiff from the defendant the sum of two thousand six hundred and eleven and 68/100 dollars."

In brief, then, the complaint sets out the execution of a lease of mining property by plaintiff to defendant, the entry thereunder by the latter into possession of said premises, the extraction therefrom of a certain value of gold, the amount due plaintiff under said contract of lease and the payment of all said amount except the sum of $2,611.68, no part of which has been paid.

Upon a general view we would conclude that there are thus exhibited all the elements that are usually found and that the rules of pleading require in a cause of action like this. And it may be said that a deliberate consideration of the specific criticism of appellant does not disturb the impression created by a cursory reading of the complaint.

No allegation of a demand for the payment of the rent was essential to the statement of a cause of action. While the lease is somewhat uncertain as to whether the rent or royalty was to be paid in gold dust or bullion alone or in money, the more reasonable construction seems to be the one obviously placed upon the lease by the parties themselves and followed by the court below. The terms used in said lease would indicate that gold dust and money were considered as equiv-

alent and in the answer it is alleged, substantially, that appellant paid respondent as rent under the lease the sum of $18,888.83. The construction of the lease adopted and acted upon by the parties to it should, of course, prevail where uncertainty exists as to the precise meaning of any of its terms. The lease also specified the time within which the payment should be made. While no particular day, for obvious reasons, is designated for payment the defendant was obligated "thereafter *during said year* to pay and *deliver* to said lessor as rent and royalty" the amount set forth. The precise time of payment and whether it should be made in more than one installment was left to the discretion of the defendant, but it is clear that the whole amount of the annual rent would be due at the end of the year and, if not paid, then an action would lie for its recovery, and this complaint was filed after the end of the year. The same result would follow whether the payment was to be made in gold dust, bullion, or money. Neither can it be said that the designation of a place for the payment was a condition precedent to the accrument of the cause of action. This was a privilege accorded to plaintiff but if it failed to exercise the option the payment should be made upon the premises. If defendant was withholding what was due on the ground that plaintiff had not designated a place for the payment, notice to that effect should of course, have been given by the former to the latter. The recital of the foregoing considerations shows that no demand for the payment or delivery of the amount claimed was required before plaintiff would be authorized to institute the action. It is simply the case of an amount clearly due under the terms of the contract when the complaint is filed and the situation is entirely different from those instances where the cause of action does not accrue until a demand for payment is made. The matter seems so simple as hardly to justify the citation of authorities although many cases are noted by respondent in support of the action of the court below as to this point.

Manifestly, also, as suggested by respondent, a demand would have been entirely futile. In its answer appellant denies that the lease bound it to work for the full term and also denies that there is owing to respondent any sum whatever. It also sets up what was conceived to be a perfect defense to the first count of the complaint. To be consistent, then, appellant would have refused to comply with any de-

mand for payment. But the purpose of a demand in a case like this is to afford defendant an opportunity to comply with it without the annoyance and expense of suit, but when it appears that it would have been unavailing and a mere useless and idle ceremony the law does not require it. (*Cox* v. *Delmas,* 99 Cal. 120, [33 Pac. 836].)

It is clear, therefore, that if any defect in that regard existed in the complaint it is shown by the answer to have been entirely without prejudice.

With no less certainty can it be affirmed that the court was justified, as to the first count, in awarding judgment to plaintiff on the pleadings.

It was alleged that gold of the value of $62,084.64 was extracted in 1909. This was not denied in the answer. Of this it was alleged that plaintiff was entitled to $21,500.51. This is a matter of computation based upon the terms of the lease. The execution of the lease and entry thereunder are not denied. The complaint alleges that respondent has received of this sum of $21,500.51, on account of said rent, the sum of $18,888.83 and *no more.* This is not denied in the answer. From the *admitted* facts, therefore, the conclusion necessarily follows that plaintiff is entitled to judgment for the sum of $2,611.68. In view of the foregoing it is patent that the denial in the answer "that there is now due, owing or unpaid to plaintiff from defendant the sum of $2,611.68 or any other sum or sums whatever" involves a mere legal conclusion arising probably from a misconstruction of the terms of the lease. The proper way to present an issue as to this material question was to set forth *facts* showing that plaintiff was not entitled to said sum of $21,500.51 or to allege that the full amount had been paid.

Likewise there is no semblance of defense in the claim of an executed oral contract. There is a missing link between it and the written contract of lease upon which plaintiff relied. The allegation is "that after defendant had notified plaintiff of its intention to remove its dredger from said premises, and while defendant was actually engaged in the moving of its said dredger off the said placer mining claims, plaintiff, through its agents thereunto duly authorized, employed defendant to work out and extract the gold and gold dust from certain small pieces or blocks of unworked ground which had been left unworked by plaintiff in its theretofore mining

operations upon said placer claims, and which were covered with tailings and tailing piles; and in this connection plaintiff agreed to pay and deliver to defendant as compensation for working out said small pieces or blocks of unworked ground, eighty per cent of the gross product of gold derived therefrom'' and that defendant accepted said employment and under this agreement took out gold of the value of $13,543.36 and delivered to plaintiff twenty per cent thereof as agreed, but there is nothing to show that this contract was intended as a substitute for the one set out in the complaint or, indeed, that the two were related in any manner. We must assume that they were entirely disassociated and distinct. In other words, this declared defense utterly lacks responsiveness and relevancy to the cause of action. Of course, it is elementary that if the answer sets up an affirmative defense, it must state facts which are related to the facts averred by plaintiff and which constitute a defense thereto. (31 Cyc. 157.) In the absence of any allegation or circumstance showing that this oral agreement had any relation to the written contract or was intended to modify or affect it in any manner we must regard said oral agreement as a matter utterly extraneous and inapposite. "As a matter of pleading appellant could not avoid a contract alleged in the petition by answering that he had made with appellee another and different contract." (*Tyler* v. *Coleman* (Ky.), 97 S. W. 373.)

Other valid objections to the so-called defense are urged by respondent but we deem further inquiry as to this point unnecessary and inadvisable.

The third defense is equally without merit. The claim is that it was "a custom among miners of Alaska that unless it is specifically set forth in the lease that the lessee shall continue to operate the leased premises during the whole term for which the lease is given, a lessee is permitted and has the right to cease working under the lease, and remove from the leased premises whenever he chooses so to do."

This is also entirely unresponsive to the complaint. It does not appear how this custom could or did impair the right of plaintiff to receive the rent or royalty provided for in the lease or in what manner this custom affected the acts of the parties to said contract.

Besides, the terms of the contract as to the time of operation are plain enough and no evidence of custom would be admissible upon the subject. A contract cannot be varied by evidence of usage. Custom can be shown only when the terms of the contract are obscure or uncertain. (Code Civ. Proc., sec. 1870; *Withers* v. *Moore*, 140 Cal. 591, [74 Pac. 159].)

In dismissing this first branch of the case it may be said that no offer was made by defendant to amend its answer and we must assume that its defense was as fully set forth as the facts would warrant.

In considering the judgment on the second count we note preliminarily that during the seasons of 1907 and 1908 defendant operated under the terms of the written lease and the dredger was left at a certain point on the claim during the winter of 1908–9 and, on June 4, 1909, work was again started and continued till the 12th of August following. On August 11 preceding, the "manager" and the "managing owner" sent to plaintiff a telegram to the effect that unless the royalty were reduced to ten per cent operations would be suspended. The next day, without waiting for an answer, they abandoned operations and proceeded to move the dredger off the premises. On the way out they were engaged for five days in dredging a rich spot from which was realized quite a sum of money and, on September 1, they left plaintiff's property and did not thereafter return.

Plaintiff's theory, as stated by its counsel and as appears from the record, was that the defendant was answerable to it for the damage occasioned by the deliberate breach of its affirmative obligation to work the property. It is not disputed by appellant that it did abandon the work nor is it claimed that the ground into which the dredger was entering on August 12 was not dredgable or that the season prevented further operations. The sole contention of defendant seems to have been that it was justified in discontinuing the work for the reason that the remaining ground was not rich enough to enable defendant to dredge it at a profit and that if it continued work the dredger would be so far south at the end of the season that the whole of the next season would be lost in moving up stream to the scene of its next operations.

The measure of damage claimed by respondent was the *percentage* of the amount of gold that defendant could have extracted after August 12, 1909, had it operated until the end

of the season, obtained by deducting from the percentage of royalty provided for in the agreement the greatest obtainable or "market" percentage of royalty for working the property at the date of the breach or thereafter. The fairness of the rule is not called in question but it is claimed by appellant that no damage should have been allowed for the reason stated above.

In support of its theory plaintiff introduced evidence to show: 1. The total number of cubic yards of gold-bearing gravel that defendant could have mined between August 12 and the end of the season; 2. The average gold value of this ground per cubic yard, and, 3. The best obtainable or "market" percentage of royalty for working the claims at the date of the breach or thereafter.

The court found that, on August 12, 1909, there still remained on the premises over seventy thousand cubic yards of dredgable gold-bearing gravel which had not been worked; that there remained, excluding the five days that defendant used in dredging said rich spot, sixty-seven working days during which it could have mined the premises had defendant continued operations; that the capacity of the dredger was one thousand cubic yards per day; that the gold-bearing gravel which remained and could have been worked by defendant averaged in value fifty cents a cubic yard; that the greatest obtainable or market royalty for working the premises was, on August 12, the date of the breach, and at all times thereafter, not greater than fifteen per cent of the gross amount of gold extracted. It was further found that the defendant had extracted, under the lease, during the year 1909, gold of a value greater than fifty thousand dollars. By simple calculation, therefore, the conclusion was reached that plaintiff was entitled to damages in the sum of $8,375.

As to these findings of fact it may be said generally that they are all supported by the evidence, some of which may appear in the consideration of some of the contentions of appellant.

There is no doubt that by the terms of the lease defendant bound itself to work continuously as far as the weather and the season of the year would permit. Otherwise, what do the following words mean: "To do said work *as steadily and continuously as the weather* and the season of the year will permit?" While it is not expressly provided that the work shall

continue until the end of the lease, this is necessarily implied in the use of the phrase *"from date of this lease."* It is thus to be seen that no warrant exists for the contention that appellant might discontinue the work if it proved unprofitable or by reason of any such custom that was supposed to prevail. It could hardly be made to appear more clearly that appellant was obligated to continue dredging during the entire term of the lease except when prevented by the *weather* and the *season of the year.*

To what we have said as to custom may be added the consideration that no evidence whatever was offered at the trial in proof of such custom and it is not a matter of which the court would take judicial notice. (Code Civ. Proc., sec. 1875.)

As to the declared executed oral agrement, it was not pleaded to the second count of the complaint nor was there any evidence offered in its support and no further comment seems called for.

It is contended that plaintiff could have worked the ground itself or obtained a lessee to do so at a greater profit than it would have received from defendant if it had continued working to the end of the term. The finding of the court, however, is directly opposed to this view and it is amply supported by the evidence. Of course, it is true, also, that plaintiff was not required to work the ground but it had a right to rely upon the faith of defendant pledged to the observance of all the terms of the lease.

What has been said is probably a sufficient answer to the claim that the instrument under which defendant took possession of the premises constituted a mere license. It may be added that the instrument is called an "indenture of lease," the parties are named "lessor" and "lessee," that by its terms the lessor "grants, demises, leases and lets" unto the lessee for a term of three years not only the right and privilege of mining but the *land itself*, that it provides for the payment of "rent" and contains the forfeiture and entry clauses, and those against assigning or subletting, which are usually found in leases. When the intention of the parties to the instrument has been ascertained and there is nothing therein opposed to public policy the covenants must be observed, although it may develop that the bargain may be unprofitable to one or both of said parties.

The point is hardly worth further consideration and we need not refer to the many cases cited, but we add the following quotation from *Walker* v. *Tucker*, 70 Ill. 527, a similar case to the one at bar: "The courts must enforce contracts as the parties made them. They cannot super-add conditions or restrictions which the parties have not themselves thought fit to impose in making their contracts. There is nothing in this instrument which authorizes a suspension or abandonment of mining because it has become unprofitable. . . . It is elementary law that, when the contract is to do a thing possible in itself, the promisor will be liable for a breach thereof, notwithstanding it was beyond his power to perform it for it was his own fault to run the risk of undertaking to perform an impossibility when he might have provided against it by his contract."

Respondent has also cited figures from the record to show that had defendant continued its operations under the lease till the end of the term it would at least have made a *reasonable* profit, but we deem this immaterial.

It is argued that the damages were so uncertain as to be impossible of ascertainment. Of course, reasonable probability is all that is required. To *demonstrate* the amount of the loss of respondent it would be necessary to dredge all the gold-bearing ground that could have been worked in the number of days that defendant was idle but should have been employed. This was impracticable, but great care seems to have been taken in furnishing the most satisfactory evidence that was available. The capacity of the dredger, the number of working days left and the character and quality of the unworked soil were inquired into and disclosed by the testimony of witnesses and these elements were made the basis of the court's conclusion as to the damage suffered by respondent.

But it is the doctrine of common justice, as well as of the authorities, that, since the difficulty of ascertaining *exactly* how much plaintiff was injured arose from defendant's breach of its contract, scant attention will be paid to its complaint that greater accuracy was not obtainable. It is said, in *Shoemaker* v. *Acker*, 116 Cal. 244, [28 Pac. 64], that "Progressive profits, as damages, present one of the most difficult subjects with which courts have to deal. It is not the law, however, that they can never be recovered. . . . But where

the prospective profits are the natural and direct consequences of the breach of the contract they may be recovered; and he who breaks the contract cannot wholly escape on account of the difficulty which his own wrong has produced of devising a perfect measure of damages,'' citing cases.

Another contention of appellant, in which it seems to have considerable confidence, may be stated as follows: During the five days defendant worked on the isolated rich spots it extracted gold of the value of $13,545.36. Had it been working on the ground contiguous to that on which it was working, on August 12, it would have taken out, on the ground value found by the court, five hundred dollars per day or the total of two thousand five hundred dollars. The claim is, therefore, that it should be given credit for the difference between $13,545.36, which it actually extracted, and two thousand five hundred dollars, which it would have extracted if it had worked according to its contract, or with twenty-two days' work, which would have been required to extract the larger amount from the cheaper ground. In either event the result would be to reduce the judgment by $2,761, which is twenty-five per cent of $11,045. The court, however, held that appellant was only entitled to a credit for the five days actually consumed in working the said rich spots out of the total of seventy-seven days remaining.

There can be no doubt of the soundness of the court's conclusion. It is not a question of the relative richness of the various spots of gold-bearing soil. Under the contract it was the duty of defendant to operate its dredger not only during the entire period that it was operated, but also for sixty-seven days additional. It is equally true that respondent was entitled to the specified percentage of what was extracted, however much or little, and of what *would have been* extracted had the work continued for the entire term. It was the good fortune of appellant to strike a rich spot, but its operation there was affected by the same terms of the contract as applied to the other ground. Appellant was bound to pay and deliver to respondent a certain percentage ''of *all* gold and precious minerals extracted'' during the entire season.

There is no more merit in the claim that since no witness testified directly that the unworked ground would average fifty cents per cubic yard in value, the finding to that effect is unsupported. It is not denied that one witness testified

that it would average fifty-five cents a cubic yard and another that it would average sixty cents a cubic yard, and it is therefore argued that the finding should have been in accordance with one of these figures or a less one, as testified by another witness. Since a higher value would have been supported, appellant is in no position to attack the finding of a lower value. The greater includes the less.

The various positions of appellant, when carefully examined, lead necessarily, we think, to the conclusion that this appeal is quite destitute of merit, and the judgment and order are affirmed.

Chipman, P. J., and Hart, J., concurred.